# HOKE AND ECONOMIDES *v.* UNITED STATES.

## ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF TEXAS.

No. 381.   Argued January 7, 8, 1913.—Decided February 24, 1913.

The power given to Congress by the Constitution over interstate commerce is direct, without limitation and far reaching. *Hipolite Egg Co.* v. *United States*, 220 U. S. 45.

Commerce among the States consists of intercourse and traffic between their citizens and includes the transportation of persons as well as property.

While our dual form of government has its perplexities, State and Nation having different spheres of jurisdiction, we are one people and the powers reserved to the States and those conferred on the Nation are adapted to be exercised, whether independently or concurrently, to promote the general welfare, material and moral.

While women are not articles of merchandise, the power of Congress to regulate their transportation in interstate commerce is the same, and it may prohibit such transportation if for immoral purposes.

The right to be transported in interstate commerce is not a right to employ interstate transportation as a facility to do wrong, and Congress may prohibit such transportation to the extent of the White Slave Traffic Act of 1910.

Congress may adopt not only the necessary, but the convenient, means necessary to exercise its power over a subject completely within its power, and such means may have the quality of police regulations. *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196.

The White Slave Traffic Act of June 25, 1910, c. 395, 36 Stat. 825, is a legal exercise of the power of Congress under the commerce clause of the Constitution and does not abridge the privileges or immunities of citizens of the States or interfere with the reserved powers of the States, especially those in regard to regulation of immoralities of persons within their several jurisdictions.

A variance which is merely verbal as to the name of the railroad over which transportation was obtained in violation of the White Slave Traffic Act and which did not prejudice the defense, *held* in this case not to be reversible error.

It is for the jury to determine the sufficiency of the evidence tending to show that defendants induced women to become passengers in interstate commerce in violation of the Act, and in this case it does not appear that their judgment was not justified.

One can violate the White Slave Traffic Act through a third party acting for him.

Evidence of acts of defendants after the end of the journey *held* in this case to be admissible to show the action of defendants in inducing the transportation of women in interstate commerce in violation of the White Slave Traffic Act.

There was no error in the various instructions of the court in this case.

187 Fed. Rep. 992, affirmed.

THE facts, which involve the constitutionality under various provisions of the Federal Constitution of the act of June 25, 1910, prohibiting transportation in interstate and

foreign commerce of women and girls for immoral purposes, known as the White Slave Act, are stated in the opinion.

*Mr. C. W. Howth,* with whom *Mr. Hal W. Greer, Mr. T. H. Bowers* and *Mr. C. C. Luzenberg* were on the brief, for plaintiffs in error:

The act is contrary to and contravenes Art. IV, § 2, of the Constitution in this: That though they are generally and justly deemed immoral, yet prostitutes, both male and female, are citizens of their respective States, with all the "privileges and immunities" possessed by any other citizen; and one of their "privileges" is to travel interstate; and so long as this privilege exists as a lawful right, it is the "privilege" and lawful right of any other citizen to aid and assist, persuade and entice, them to take the journey, regardless of their motive or purpose and regardless of the motive and purpose of the one rendering the aid, as to what they shall do or intend to do at the end of their journey. *Paul v. Virginia,* 8 Wall. 168; *United States v. Harris,* 106 U. S. 629.

The right to travel interstate is a fundamental privilege and immunity of citizenship, regardless of moral or immoral intent of the traveler at the end of the journey.

The White Slave Act does not in itself attempt to define or make a crime of prostitution.

The act does not forbid the carriage interstate of prostitutes, even though they be known as such.

The act does not prohibit the carriage interstate of a woman or girl who intends to ply the avocation of prostitution at the end of her journey, if she furnishes her own money or means of transportation. This is because Congress realized that it did not have power to include that, either because it would abrogate Art. IV, § 2, or the reserved powers of the States individually.

Congress has no power to define and punish as a crime the acts of one who aids another to do a lawful thing.

As to Economides it is presumed that the verdict of the jury will be held conclusive on the facts, and they are therefore stated as established.

Defendants although engaged in a very disreputable, but lawful, business, had the privilege and immunity as a citizen of a State, to argue with, persuade, and prevail, upon three other citizens of that State to go to a point in another State, he in no other respect rendering any actual aid or assistance.

In the absence of an allegation in the indictment that these women were being carried under duress, or against their wills, or in some other involuntary form, or by some fraudulent device were induced to go, they had these rights:

They could have stopped off at any place in Louisiana where the train stopped and have thus broken the interstate feature of the indictment.

Even after reaching Beaumont and before going to the place of prostitution they could have purchased transportation and returned to Louisiana, or have gone to some other place than Beaumont.

After reaching their destination at Beaumont and before going into the house of prostitution, they could have hired out for domestic service, or changed their occupation into some other than prostitution.

In either of these three events, the criminality of the acts charged in the indictment would have been completely destroyed.

The act is void in that it conflicts with the reserved police powers of the States individually to regulate or prohibit prostitution or any other immoralities, of their citizens. Amendments IX and X of the Constitution; *Keller* v. *United States,* 213 U. S. 143; *Fairbank* v. *United States,* 181 U. S. 283; *Barron* v. *Baltimore,* 7 Pet. 243.

The Congress of these United States, as a legislative body, is one of limited powers prescribed by the Consti-

tution, and can pass no valid enactment unless it comes strictly within some one or more of the provisions conferring the power; and all powers not so expressly granted to Congress, by the Constitution, were reserved to the States individually.

The act is unconstitutional in that it does not come within the terms of Art. I, § 8, subd. 2, relating to the power to regulate commerce among the States, or any other grant of power in this: that while the carrying of passengers interstate comes within the power to regulate commerce, the motive or intent of the passenger either before beginning the journey, or during, or after completing it, is not a matter of interstate commerce. *Keller* v. *United States*, 213 U. S. 143; *Lottery Case*, 188 U. S. 32; *The Popper Case*, 98 Fed. Rep. 423; *Fairbank* v. *United States*, 181 U. S. 283.

Prostitution is not a crime against the Federal Government as such except in Territories exclusively under Congressional control, but of the States individually.

In every offense save this one a conviction for crime must depend upon the intent to commit the crime; but here the intention is the crime where no real crime may in fact be committed.

In all other cases the shipment of the forbidden commodity interstate, as well as its receipt, constitutes the crime; but here though the aid of the passenger may be lawful, yet if the person giving it intends the recipient shall do an immoral thing at the end of her journey, whether she does it or not, makes the person rendering the aid a felon.

Congress has not the constitutional power to make prostitution a crime within the limits of any State.

The power to regulate interstate commerce does not confer upon Congress the power to regulate the morality or any other immorality (a phrase broad enough to reach drinking, gambling, exposure of person, fighting, lying,

profanity—in fact any frailty which the flesh is heir to) of citizens individually.

If so there is no such thing reserved to the States *per se* as police powers, for any other immorality is broad enough to cover every crime defined in the criminal codes and codes of criminal procedure in every State in the Union.

Where both the right to interstate carriage and the fact of carriage are lawful within themselves, there is nothing of "commerce between the States" which Congress can prohibit.

The defendants should have been acquitted on the merits.

*Mr. Assistant Attorney General Harr* for the United States: [1]

Section 8 of the act provides that it shall be known and referred to as the "White Slave Traffic Act," and the several provisions of the act show that its underlying purpose is the suppression of traffic in women and girls for immoral purposes so far as such traffic comes within the jurisdiction of Congress over interstate and foreign commerce. This purpose was also plainly stated by the committees of Congress in recommending the passage of the bill (H. Rept., No. 47, 61st Cong., 2d Sess.; S. Rept., No. 886, 61st Cong., 2d Sess.).

That the act is intended as a regulation of the transportation of persons as passengers appears from § 5, which provides that violations of §§ 2, 3 and 4 may be prosecuted in any district from, through or into which any such woman or girl may have been carried or transported as a passenger.

[1] The brief of the Government is entitled not only in No. 381, but also in the other *White Slave Traffic Cases* argued simultaneously therewith, to wit, No. 588, *Athanasaw v. United States, post,* p. 326; No. 603, *Bennett v. United States, post,* p. 333; and No. 602, *Harris v. United States, post,* p. 340.

The act reaches procurers and panderers and those engaged in conducting immoral houses, shows, etc., who, treating women and girls as subjects of barter and gain, transport or cause them to be transported, or facilitate their transportation, from one State to another, or to a foreign country, for immoral purposes. It does not penalize either the voluntary going or coming of women for the purpose of prostitution, nor the act of one who, for charitable or philanthropic reasons, extends aid to an unfortunate female by purchasing transportation for her. Nor would a common carrier or its agents be guilty of violating the act simply by transporting a woman or girl who may intend to engage in prostitution.

The act is constitutional as a regulation of interstate and foreign commerce.

Transportation and transit of persons is commerce, persons being both the subject and the means of commercial intercourse.

The statement of Mr. Justice Barbour, in *New York* v. *Miln*, 11 Pet. 102, 136, that persons "are not the subject of commerce," has never received the sanction of the court, but has been expressly refuted. *Passenger Cases*, 7 How. 282, 429; *Henderson* v. *New York*, 92 U. S. 259; *Mobile* v. *Kimball*, 102 U. S. 691; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196; *Pickard* v. *Pullman Car Co.*, 117 U. S. 34; *McCall* v. *California*, 136 U. S. 104; *Covington Bridge Co.* v. *Kentucky*, 154 U. S. 204.

We are concerned here only with the matter of transportation, which, so far as interstate or foreign, is clearly traffic and subject to the regulative power of Congress; although the decisions of this court are also to the effect that transit of persons, interstate or foreign, is also within the jurisdiction of Congress.

The regulative power of Congress extends to the absolute prohibition of the transportation and transit in interstate or foreign commerce of certain subjects of commerce.

See *The Lottery Case*, 188 U. S. 321, establishing the principle that it is equally within the power of Congress, in regulating interstate commerce, to protect the public morals as it is to protect the public health or the economic welfare of the people, and it is upon this principle that the White Slave Traffic Act rests.

Congress has also enacted quarantine legislation for the purpose of preventing persons from introducing contagious diseases into the United States from foreign countries or spreading the same from State to State, and its authority to do so has been repeatedly recognized by this court. *Morgan* v. *Louisiana*, 118 U. S. 455, 464; *Louisiana* v. *Texas*, 176 U. S. 1, 21; *Compagnie Francaise, &c.,* v. *Board of Health,* 186 U. S. 380, 387, 389.

Necessarily, such legislation can only rest upon the theory that Congress can regulate the transportation and transit of persons in interstate or foreign commerce, to the extent of prohibition, if the public welfare demands it.

The transportation of women and girls for the purpose of prostitution or debauchery or other immoral purpose is one of the kinds of interstate or foreign commerce that may be suppressed by Congress.

The act is not an encroachment upon the police powers of the States. It merely aids the States in the enforcement of their own laws on the subject of immorality.

While the States alone can regulate the practice of prostitution therein, *Keller* v. *United States*, 213 U. S. 138, so far as it is conducted through the channels of interstate or foreign commerce, it becomes a matter of congressional regulation.

Even if the States may, under their police powers, prohibit prostitutes or other immoral persons from coming or being transported into their limits, that fact does not remove the subject from congressional control. See, as to quarantine laws, *Compagnie Francaise* v. *Board of Health,*

186 U. S. 387, 389; *Reid* v. *Colorado*, 187 U. S. 137; *Lottery Case*, 188 U. S. 358.

The act is not an unwarranted invasion of personal liberty. *Addyston Pipe Co.* v. *United States*, 175 U. S. 229; *Lottery Case, supra; Reid* v. *Colorado*, 187 U. S. 151.

Having the power to prohibit the transportation of women and girls in interstate and foreign commerce for immoral purposes, and having exercised such power, Congress may make the prohibition effectual by punishing any person who knowingly induces, solicits, or facilitates such illegal transportation.

As to the power of Congress effectively to regulate interstate commerce by reaching unlawful acts in their very inception, see *Hipolite Egg Co.* v. *United States*, 220 U. S. 45.

So, because the solicitation of interstate commerce is a matter of Federal regulation exclusively, the State cannot impose a license tax thereon. *Robbins* v. *Shelby Taxing District*, 120 U. S. 489; *Asher* v. *Texas*, 128 U. S. 129; *McCall* v. *California*, 136 U. S. 104.

The provision of the act with reference to persons purchasing tickets for women and girls for the purpose of being transported in interstate or foreign commerce for immoral purposes, and those relating to the persuasion, inducement, enticement, or coercion of women and girls to go and be transported in such commerce, are similar to the provisions in the immigration laws making it an offense to assist, encourage, or solicit the importation or migration of alien contract laborers, upheld in *United States* v. *Craig*, 28 Fed. Rep. 795.

MR. JUSTICE MCKENNA delivered the opinion of the court.

Error to review a judgment of conviction under the act of Congress of June 25, 1910, entitled "An Act to

further regulate interstate and foreign commerce by prohibiting the transportation therein for immoral purposes of women and girls, and for other purposes." 36 Stat. 825, c. 395. It is commonly known as the White Slave Act.

The constitutionality of the act was assailed by demurrer, and as its sufficiency otherwise was not questioned a brief summary of its allegations is all that is necessary.

The charge against Effie Hoke is that she "did, on the fourteenth day of November, A. D. 1910, in the City of New Orleans and State of Louisiana, unlawfully, feloniously and knowingly persuade, induce and entice one Annette Baden, alias Annette Hays, a woman, to go from New Orleans, a city in the State of Louisiana, to Beaumont, a city in the State of Texas, in interstate commerce for the purpose of prostitution," etc.

The charge against Basile Economides is that he "did unlawfully, feloniously and knowingly aid and assist the said Effie Hoke to persuade, induce and entice the said Annette Baden . . . to go in interstate commerce . . . for the purpose of prostitution," with the intent and purpose that the said woman "should engage in the practice of prostitution in the said city of Beaumont, Texas."

The second and third counts make the same charge against the defendants as to another woman, the one named in the third count being under eighteen years.

The demurrers were overruled and after trial the defendants were convicted and sentenced, each to two years imprisonment on each count. 187 Fed. Rep. 992.

The indictment was drawn under §§ 2, 3 and 4 of the act, which sections are as follows:

"SEC. 2. That any person who shall knowingly transport or cause to be transported, or aid or assist in obtaining transportation for, or in transporting, in interstate or foreign commerce, or in any Territory or in the District of Columbia, any woman or girl for the purpose of prosti-

tution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice; or who shall knowingly procure or obtain, or cause to be procured or obtained, or aid or assist in procuring or obtaining, any ticket or tickets, or any form of transportation or evidence of the right thereto, to be used by any woman or girl in interstate or foreign commerce, or in any Territory or the District of Columbia, in going to any place for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent or purpose on the part of such person to induce, entice, or compel her to give herself up to the practice of prostitution, or to give herself up to debauchery, or any other immoral practice, whereby such woman or girl shall be transported in interstate or foreign commerce, or in any Territory or the District of Columbia, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding five thousand dollars, or by imprisonment of not more than five years, or by both such fine and imprisonment, in the discretion of the court."

Section 3 is directed against the persuasion, inducement and enticement of any woman or girl to go from one place to another in interstate or foreign commerce, whether with or without her consent, to engage in the practices and for the purposes stated in the first section, and provides that "any one who shall thereby knowingly cause or aid or assist in causing such woman or girl to go or to be carried or transported as a passenger upon the line or route of any common carrier or carriers in interstate or foreign commerce, or any Territory or the District of Columbia," shall be punished as prescribed in the first section.

Section 4 makes criminal the persuasion, inducement and enticement of a woman or girl under the age of eight-

een years from any State or Territory or the District of Columbia to any other State or Territory or the District of Columbia to engage in the immoral practices enumerated. The person guilty thereof and who shall in furtherance thereof knowingly induce or cause such woman or girl to be carried or transported as a passenger in interstate commerce shall be deemed guilty of a felony and on conviction the offender's punishment may be a fine of ten thousand dollars or imprisonment for ten years, or by both fine and imprisonment, in the discretion of the court.

The grounds of attack upon the constitutionality of the statute are expressed by counsel as follows:

"1. Because it is contrary to and contravenes Art. IV, § 2, of the Constitution of the United States, which reads: 'The citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States.'

"2. Because it is contrary to and contravenes the following two amendments to the Constitution:

"Art. IX. The enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people.

"Art. X. The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

"3. Because that clause of the Constitution which reserves to Congress the power (Art. I, Sec. 8, Subdiv. 2) 'To regulate Commerce with foreign Nations, and among the several States,' etc., is not broad enough to include the power to regulate prostitution or any other immorality of citizens of the several States as a condition precedent (or subsequent) to their right to travel interstate or to aid or assist another to so travel.

"4. Because the right and power to regulate and control prostitution, or any other immoralities of citizens, comes within the reserved police power of the several States,

and under the Constitution Congress cannot interfere therewith, either directly or indirectly, under the grant of power 'to regulate commerce between the States.'"

We shall discuss at length but one of these grounds; the others will be referred to incidentally. The power of Congress under the commerce clause of the Constitution is the ultimate determining question. If the statute be a valid exercise of that power, how it may affect persons or States is not material to be considered; It is the supreme law of the land and persons and States are subject to it.

Congress is given power "to regulate commerce with foreign nations and among the several States." The power is direct; there is no word of limitation in it, and its broad and universal scope has been so often declared as to make repetition unnecessary. And, besides, it has had so much illustration by cases that it would seem as if there could be no instance of its exercise that does not find an admitted example in some one of them. Experience, however, is the other way, and in almost every instance of the exercise of the power differences are asserted from previous exercises of it and made a ground of attack. The present case is an example.

Commerce among the States, we have said, consists of intercourse and traffic between their citizens, and includes the transportation of persons and property. There may be, therefore, a movement of persons as well as of property; that is, a person may move or be moved in interstate commerce. And the act under consideration was drawn in view of that possibility. What the act condemns is transportation obtained or aided or transportation induced in interstate commerce for the immoral purposes mentioned. But an objection is made and urged with earnestness. It is said that it is the right and privilege of a person to move between States and that such being the right, another cannot be made guilty of the crime of inducing or assisting or aiding in the exercise of it and "that the

motive or intention of the passenger, either before beginning the journey, or during or after completing it, is not a matter of interstate commerce." The contentions confound things important to be distinguished. It urges a right exercised in morality to sustain a right to be exercised in immorality. It is the same right which attacked the law of Congress which prohibits the carrying of obscene literature and articles designed for indecent and immoral use from one State to another. Act of February 8, 1897, 29 Stat. 512, c. 172. *United States* v. *Popper*, 98 Fed. Rep. 423. It is the same right which was excluded as an element as affecting the constitutionality of the act for the suppression of lottery traffic through national and interstate commerce. *Lottery Case*, 188 U. S. 321, 357. It is the right given for beneficial exercise which is attempted to be perverted to and justify baneful exercise as in the instances stated and which finds further illustration in *Reid* v. *Colorado*, 187 U. S. 137. This constitutes the supreme fallacy of plaintiffs' error. It pervades and vitiates their contentions.

Plaintiffs in error admit that the States may control the immoralities of its citizens. Indeed, this is their chief insistence, and they especially condemn the act under review as a subterfuge and an attempt to interfere with the police power of the States to regulate the morals of their citizens and assert that it is in consequence an invasion of the reserved powers of the States. There is unquestionably a control in the States over the morals of their citizens, and, it may be admitted, it extends to making prostitution a crime. It is a control, however, which can be exercised only within the jurisdiction of the States, but there is a domain which the States cannot reach and over which Congress alone has power; and if such power be exerted to control what the States cannot it is an argument for—not against—its legality. Its exertion does not encroach upon the jurisdiction of the States. We have

cited examples; others may be adduced. The Pure Food and Drugs Act (June 30, 1906, 34 Stat. 768, c. 3915) is a conspicuous instance. In all of the instances a clash of national legislation with the power of the States was urged, and in all rejected.

Our dual form of government has its perplexities, State and Nation having different spheres of jurisdiction, as we have said, but it must be kept in mind that we are one people; and the powers reserved to the States and those conferred on the Nation are adapted to be exercised, whether independently or concurrently, to promote the general welfare, material and moral. This is the effect of the decisions, and surely if the facility of interstate transportation can be taken away from the demoralization of lotteries, the debasement of obscene literature, the contagion of diseased cattle or persons, the impurity of food and drugs, the like facility can be taken away from the systematic enticement to and the enslavement in prostitution and debauchery of women, and, more insistently, of girls.

This is the aim of the law expressed in broad generalization; and motives are made of determining consequence. Motives executed by actions may make it the concern of Government to exert its powers. Right purpose and fair trading need no restrictive regulation, but let them be transgressed and penalties and prohibitions must be applied. We may illustrate again by the Pure Food and Drugs Act. Let an article be debased by adulteration, let it be misrepresented by false branding, and Congress may exercise its prohibitive power. It may be that Congress could not prohibit the manufacture of the article in a State. It may be that Congress could not prohibit in all of its conditions its sale within a State. But Congress may prohibit its transportation between the States, and by that means defeat the motive and evils of its manufacture. How far-reaching are the power and the

means which may be used to secure its complete exercise we have expressed in *Hipolite Egg Co.* v. *United States*, 220 U. S. 45. There, in emphasis of the purpose of the law, we denominated adulterated articles as "outlaws of commerce" and said that the confiscation of them enjoined by the law was appropriate to the right to bar them from interstate transportation and completed the purpose of the law by not merely preventing their physical movement but preventing trade in them between the States. It was urged in that case as it is urged here that the law was an invasion of the power of the States.

Of course it will be said that women are not articles of merchandise, but this does not affect the analogy of the cases; the substance of the congressional power is the same, only the manner of its exercise must be accommodated to the difference in its objects. It is misleading to say that men and women have rights. Their rights cannot fortify or sanction their wrongs; and if they employ interstate transportation as a facility of their wrongs, it may be forbidden to them to the extent of the act of June 25, 1910, and we need go no farther in the present case.

The principle established by the cases is the simple one, when rid of confusing and distracting considerations, that Congress has power over transportation "among the several States"; that the power is complete in itself, and that Congress, as an incident to it, may adopt not only means necessary but convenient to its exercise, and the means may have the quality of police regulations. *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 215; Cooley, Constitutional Limitations, 7th ed. 856. We have no hesitation, therefore, in pronouncing the act of June 25, 1910, a legal exercise of the power of Congress.

There are assignments of error based upon rulings on the admission and rejection of evidence and upon the instructions to the jury and the refusing of instructions.

The asserted errors are set forth in twenty-five bills of exceptions and the special assignment of errors in this court occupy twenty-eight pages of the record, and present the constitutional objections to the law in all the aspects that counsels' ingenuity can devise. A like ingenuity has been exercised to represent the many ways in which the conduct of the accused can be viewed and shown to be inconsistent with a guilty purpose. To discuss them all is unnecessary. We shall pass more or less rapidly over those we consider to be worthy of attention.

1. It is contended that there is variance between the indictment and the proof in that the indictment charges that the women were transported over the Texas & New Orleans Railroad Company's road and that the Government failed to prove that such road was a line extending from New Orleans to Beaumont, Texas, these places marking the beginning and end of the transportation of the women. Further, that the proof showed that their tickets were purchased over the Southern Pacific Road. The indictment alleges that the Texas & New Orleans Railroad was a part of the Southern Pacific System, and was commonly known as the "Sunset Route," and there was through transportation. The variance is not much more than verbal, and that it prejudiced their defense in any way is not shown. If it is error at all it does not appear to have caused even embarrassment to the defense. But was it error? See *Westmoreland* v. *United States*, 155 U. S. 545, 549. Also § 1025, R. S.

2. The evidence does not show that the defendants or either of them induced, etc., the women to become passengers in interstate commerce. The particulars are recited wherein it is contended that the evidence is deficient. It is not necessary to review them. It was for the jury to consider and determine the sufficiency of the evidence, and we cannot say they were not justified by it in the judgment they pronounced.

3. It is contended that Florence Baden persuaded her sister Gertrude to go to Beaumont and an instruction of the court is attacked on the ground that it declared the charge of the indictment was satisfied against the defendants if Florence acted for them. There was no error in the instruction under the circumstances shown by the record.

4. Error is assigned on the refusal of the court to give certain instructions requested by defendants. To consider them in detail would require a lengthy review of the evidence, for they present arguments on certain phases of it as to the degree of persuasion used or its sufficiency to induce or entice the women. There was no error in refusing the instructions.

5. The court permitted the women to testify as to the acts of Effie Hoke at her house at Beaumont restraining the liberty of the women and coercing their stay with her. Such testimony was relevant. The acts illustrated and constituted a completion of what was done at New Orleans. They were part of the same scheme and made clear its purpose.

There were other instructions asked by which the jury was charged that they could not convict Effie Hoke for the character of the house she kept or Economides for the business he conducted. The charge of the court sufficiently excluded both views. It explained the act of Congress and the offenses it condemned and directed the attention of the jury to them.

6. Defendants complain that they were not permitted to show that the women named in the indictment were public prostitutes in New Orleans. Such proof they contend was relevant upon the charge of persuasion or enticement. This may be admitted, but there was sufficient evidence, as the court said, of the fact of the immorality of their lives and explicitly ruled that they could be shown to be public prostitutes. The court, however, excluded

certain details sought to be proved. Under the circumstances there was no error in the ruling.

In conclusion we say, after consideration of all errors assigned, that there was no ruling made which was prejudicial to defendants.

*Judgment affirmed.*